S. N. WEBSTER v. J. C. STARK et al.

CHANCERY COURT. *Contract for sale of land. Mistake*   A court of chancery cannot rectify a contract for the sale of land upon the ground of mistake, where the mistake was not in the contract, nor in the writing embodying the contract, but in regard to an extrinsic fact, which. if 'known at the time, would probably have induced the parties to. make a different contract.

FROM ROBERTSON.

Appeal from the Chancery Court at Springfield.   B.. J. TARVER, Ch.

GARNER & SON for complainants.

STARK & JUDD for defendants.

COOPER, J., delivered the opinion of the court.

Bill to rectify a written contract for the sale of land, and to enforce its execution as rectified.   The chancellor, on final hearing, dismissed the bill, and complainant appealed.

The defendant Stark, owning land on the St. Louis and South-eastern railroad at Greenbrier station, had the land in 1875 laid off into town lots for sale. There were twenty-two lots lying equally on each side of the railroad numbered alternately, the even numbers on the west and the odd numbers on the east side of the road. A turnpike road ran parallel to the railroad on the east side, a space of about fifty feet in width between the two roads being a part of Stark's land. In the printed plan of his lots, the front line of the lots east of the two roads is marked along the eastern edge of the turnpike, but it seems that the lots were considered as crossing the turnpike, and extending to the land of the railroad company. At the southern line of Stark's land a street thirty-three feet wide was laid out on the plan, crossing the railroad at right angles. The first lot on the east side of the railroad, bounded by this street on the south, fronting eighty feet toward the railroad and running back two hundred and fifty feet, was designated in the printed plat as No. 21. The next lot to the north, of the same size, was lot No. 19. The next No. 17, and the next No. 15. Lot No. 15 had been sold and built upon, the building, as it proved on a resurvey, being six feet ten inches on lot No. 17. Across the street on the south, the land was owned by one Kinchelow, who had improved it, building his fence about the center of the proposed street. The boundaries of the lots as laid had, perhaps, been designated by stakes, which had disappeared, and much of the ground covered by lots 17,

19 and 21 had grown up in underbrush. The printed plat was posted on the door of the depot at the station, and well known to the inhabitants.

In this situation of affairs, one Hinkle was permitted, about the year 1878, to erect a mill on the space between the turnpike and the railroad, which was partly on Stark's land and partly on the land of the railroad company. The location of the mill was determined by the existence of a well on the land of the railroad company, from which water could be obtained for the purposes of the mill. The precise location of the mill in reference to the lots of Stark seems not to have been definitely known. As a matter of fact, the mill was principally upon lot No. 19, but partly also on lot No. 17. Curiously enough, the testimony fails to fix definitely where the dividing line between lots 17 and 19 strikes the mill. As near as can be ascertained, the mill extended about nine or ten feet on lot No. 17. About the first of the year 1880, Hinkle sold the mill and machinery to the complainant Webster. Within a week or two after his purchase, the complainant went to Springfield, where Stark lived, and bought from him two lots at Greenbrier. He executed his note to Stark, at 12 months, for the purchase money, $100, with interest, and Stark drew up, signed and delivered to him a contract of sale for lots 19 and 21. After his purchase, complainant made an addition to his mill on the north of about twenty feet, which defendant saw after it was partly built without objection. In April or May, 1881, the defendants W. and P. B.

Swift, having become the owners of lot 15, contracted with Stark for the purchase of lot 17, taking his bond for title.  On September 1, thereafter, Stark made them a deed to the lot, he and they knowing at the time that complainant claimed the land under. his contract. The Swifts afterwards put improvements on the lot to the value of about $250.  On October 3, 1881, the complainant filed this bill against Stark and the Swifts to have his contract rectified so as to make it include the land covered by lot 17.

'The bill says, "that on January 29, 1880, complainant entered into a contract with the defendant Stark to buy of him two lots in the town of Greenbrier," which contract is made an exhibit.  The bill continues: "At the time complainant made the contract, he was of the impression that the two lots, mentioned in the contract as Nos. 19 and 21, covered the area of lots 17, 19 and 21, and he told the defendant Stark, at the time, that he wanted to purchase the quantity of ground covered by these three lots; and he also told Stark, who fully understood it at the time, that the main inducement to purchase said ground was to get the lot on which a portion of the mill had been built, and this was lot 17.  Complainant knew nothing about how said lots were numbered, and defendant Stark told him there were but two of them, and complainant made the contract of purchase, believing that there were but two, and did it with a view of getting the ground covered by the three lots.  Complainant charges that the defendant Stark at the time he signed said contract of sale to complainant believed he was

selling to him the ground covered by lots 17, 19 and 21, and through mistake described said land as lots Nos. 19 and 21."

The defendant Stark in his answer denies that the complainant told him that he wished to purchase the ground covered by the three lots, or that his main inducement to make the purchase was to get the lot on which a portion of the mill had been built. He says that complainant said he desired to purchase two lots, one of them the lot bounded by the street on the south, which was lot No. 21, and the adjoining lot which was No. 19.

The complainant testifies, as a witness, that he bought the mill from Hinkle from one to three weeks before he traded with defendant Stark. That he told Stark he had come to buy the Hinkle mill lot, and the one adjoining it, having bought the mill from Hinkle; that he wanted the two lots so that he might have plenty of room. He adds that the defendant told him he could have them, and drew up the writings, complainant signing the note for the purchase money, and defendant the contract of sale. Further on in his deposition the witness repeats: "I bought the two lots the mill was on, which now by the plat proves to be Nos. 17 and 19. I bought them to have the lot my improvements were on."

In his deposition, the defendant Stark repeats the statements of his answer, and adds that he has no recollection, and does not believe that anything was said about the Hinkle mill. He is asked on cross-examination: "Did you understand from complainant

before you sold to him that he wanted to buy the lot the mill was on?" His reply is: "I did not. I understood him clearly to want the lot on the street, and the next one to it."

A witness is introduced by the complainant, who says he was present and heard the contract. His testimony is: "Webster told defendant Stark he wanted two lots; Stark asked him which lots he wanted, and Webster said he wanted the lot the mill was on, and the one next to it. Webster asked the price, and Stark told him $50 a piece, with interest from date. Webster said he had $40, and proposed paying it to Stark, and Stark told him to keep it, and put it in that mill. That was about all that was said, and they drew up the writings."

The complainant's bill concedes that he entered into a contract with defendant for two lots, being under the impression that the two lots mentioned in the contract as Nos. 19 and 21 covered the area of lots 17, 19 and 21. And the gravamen of his complaint is, that he made the contract believing that there were only two lots, and that defendant Stark also believed that he was selling him all the ground covered by the three lots, and through mistake described the land as lots Nos. 19 and 21. His deposition is that he told Stark he had come to buy the Hinkle mill lot, and the one adjoining it, that he wanted the two lots so that he might have plenty of room. He adds: "I bought the two lots the mill was on, which now by the plat proves to be 17 and 19. I bought them to have the lots my improvements were on." The depo-

sition, it will be noticed, does not sustain the gravamen of the bill, but plainly admits that he only bought two lots, and insists that those lots were 17 and 19 instead of 19 and 21, as inserted in the contract. Unfortunately for this view, the proof is clear that he cleared off the undergrowth, after his purchase, from lot No. 21, and offered to sell that lot to two different persons, asking an advance of $25 on the price he had given, because it was a corner lot.

The testimony of the witness introduced by the complainant, who says he was present when the contract was entered into between the parties, throws light on the real cause of the difficulty. He testifies: "Webster told defendant Stark he wanted two lots; Stark asked him which lots he wanted, and Webster said he wanted the lot the mill was on, and the one next to it. Webster asked the price, and Stark told him $50 a piece." The testimony of the complainant, the defendant, and the witness all agree on the fact that the complainant said that he had come to buy two lots, and two lots were sold him. The complainant and his witness both agree also in the fact that the complainant said he wanted the lot the mill was on and the one next to it. It is obvious that complainant thought that the mill was all on one lot, and he intended to buy that lot. He also wanted the adjoining lot, which might be, upon the supposition that the mill was on No. 19, either lot No. 21 or lot No. 17. The contract specifies lot No. 21, which was a corner lot. The testimony of the witness does not tend to show that lot No. 21 was not the one actually

contracted for. Nor does the testimony of the complainant himself, when he details what took place between him and the defendant at the time of the trade. It is only when he comes to express his conclusion from what was done, rather than the facts themselves, that he diverges from the other witnesses. When he says: "I bought the two lots the mill was on, which now by the plat proves to be Nos. 17 and 19," he is not sustained by either his bill or his own statement of the facts. For the bill and the deposition both show that he thought the mill was on one lot, and that he wanted it and the adjoining lot. And other evidence, as we have seen, shows that he took possession of lot 21, cleared and offered to sell it.

The whole difficulty has been occasioned by the fact that the mill, instead of being on one lot alone, was partly on two lots, 17 and 19. No doubt the complainant intended to buy the land on which the mill was situated, and he did buy the lot on which he, and probably the defendant, supposed it was entirely located, and on which it was principally located. If, under this mistake, he selected lot 21 as the adjoining lot and contracted for it, we see no way in which we can correct the mistake by giving him the other lot in lieu. The mistake was not in the contract, or in the writing embodying the contract, but of an extrinsic fact, which fact, if known, would probably have induced the parties to make a different contract. The mistake, such as it was, was the mistake of the complainant, and there is nothing to fix the defendant with any fault in the premises. The written instru-

ment drawn up by him embodies the contract of the parties exactly as it was entered into. There is no ground for interfering with it in any way.

Affirm the decree with costs.